# Kelly *versus* The Commonwealth.

1. A killing, to constitute murder in the first degree, without the specific intent to take life, must be clearly shown by the prosecution to have occurred in the performance of such acts as establish clearly an *attempt* to perpetrate *arson*, *rape*, *robbery*, or *burglary*.

2. To constitute a burglarious entering of a house an *attempt* to commit a rape, the *intent* must be shown to have existed at the moment of entering.

3. A prisoner is not to be affected by the act of another, unless a common purpose to do the act attempted was shown to exist between the two, for it is only in such cases that the act of one shall be deemed the act of all.

4. ACTS are necessary to constitute an *attempt*, and an *attempt* to commit a *rape* is an ineffectual offer by force, to have carnal connection.

5. To constitute murder in the first degree, where the killing happened in an attempt to perpetrate a rape, the attempt must be actual, not constructive.

6. If the prisoner and his companions were intoxicated, and there was no wilful and deliberate intention to kill, but life was taken by a blow inflicted with an iron bar, suddenly caught up on a sudden quarrel, it was not murder in the first degree, unless the killing was in an attempt to commit a rape.

7. If the facts which attend the killing do not constitute murder in the first degree, it is deemed to be murder in the second degree.

8. Where a killing has been done, but not in the perpetration or attempt to perpetrate any of the felonies enumerated in the Act of 1794, there must have been a deliberate, settled purpose, a disposition of mind leading its victim

[Kelly *v*. The Commonwealth.]

into murder, all aware of its wicked pursuit and intent upon the result, to constitute it murder in the first degree.

ERROR to the Court of Oyer and Terminer of *Allegheny county*.

James M. Kelly, John Richards and Daniel Denny, were jointly indicted in the Oyer and Terminer of Allegheny county, at the October Sessions of 1857, for the murder of Henry Weissman, on the 7th October, 1857. On application, the court granted a separate trial to the several prisoners. Kelly was first tried, and convicted January 16, 1858, of murder in the first degree, and afterwards sentenced to be hanged. Richards was acquitted, and Denny found guilty of manslaughter.

Kelly's counsel having carried his case up by writ of error, argument was had thereon at the next term of the Supreme Court, at Harrisburg, May 7, 1858. The judgment of the court was rendered on the 15th of July following, reversing the court below, and granting the prisoner a new trial, for the reasons given in the following opinion:

The main facts of the case were these: the three prisoners met on the evening of 7th October, 1857, in the borough of Lawrenceville. They drank ale together at the tavern of a Mrs. Fox. They also bought whisky at M'Crady's tavern. Near midnight, they went to the house of the deceased, Henry Weissman, a couple of miles distant, occupied by himself and his daughter, Wilhelmina. They entered the house, and the room where the deceased and his daughter slept together in one bed. On hearing them in the room, deceased jumped out of bed and asked what they wanted. They inquired for the girl. A scuffle ensued in the dark room, between deceased and one of the prisoners. Wilhelmina sprang out of bed, and seizing a bar of iron, struck the person engaged with her father. The person struck, cried out, "Oh, my," and struck the girl in return. The prisoners then left the room, but soon returned, and another scuffle ensued. Wilhelmina having given deceased the bar of iron to defend himself, fled for assistance. When leaving, she was caught by one of the party, but struck him with a pump iron, and escaped. She returned shortly with assistance, and found her father alone lying on the floor, with his skull fractured, of which he died in a few hours after.

One of the witnesses on the part of the Commonwealth, testified that he heard Kelly say to John Richards next day, that he had struck the old man with the bar of iron, and was afraid he had killed him. The Commonwealth pressed for a conviction of murder in the first degree, charging that the killing was in an attempt to commit a rape, and also that it was a premeditated murder.

The defence was, that the prisoners visited the house for the

[Kelly *v.* The Commonwealth.]

purpose of fornication only, and that the killing, if done by Kelly, was without premeditation, or any intent to take life. It was shown that Kelly had visited the girl before, that her character was that of a prostitute, and that she was at that time pregnant, though unmarried, and had been treated for syphilis. The points raised, and other facts of any importance, can be gleaned from the opinion.

*Howard* and *Snowden*, for plaintiff in error.

*Collier* and *Miller*, for the Commonwealth.

The opinion of the court was delivered July 15, 1858, by

Thompson, J.—The Commonwealth claimed a conviction on this indictment, for murder in the first degree, upon two grounds. First, that the killing was in an attempt to commit a rape on the person of the daughter of the deceased. Secondly, that it was a wilful, deliberate, and premeditated killing.

The charge of the court is before us, under and by virtue of the provisions of the Act of Assembly of 1856, allowing writs of error in criminal cases, and is brought up on a bill of exceptions. The bill is sealed at the end of the charge, and although it sets forth that "the counsel for the defendant ask the court to seal a bill of exceptions to the charge of the court on the points submitted," we must either take it, that the whole charge is intended as such answer, or that it is sent up, so that by examining the whole, we may discover what were properly the answers to the points. At all events, the charge is before us; and we think it our duty, in a case of such penal consequences involving the life of the prisoner, to see that he has had a trial according to law.

We will conduct this examination according to the classification of the grounds we have indicated, although, unfortunately for the cause of order and clearness, this was not fully observed in the court below.

The first ground, namely, that the murder was perpetrated in an attempt to commit a rape, which is capital, if made out without regard to any specific intent to kill, was pressed on the attention of the jury, in the charge of the court, and recurred to in various parts of it, without separating and distinguishing it from the second ground, and without instructions to the jury to consider them consecutively, and as distinct subjects of inquiry; so that it is impossible now to tell upon which branch of the case the prisoner was convicted; or whether or not upon both, or upon a union of the two, the one requiring no specific intent to kill, if the alleged attempt was made out, and the other, according to the statute, only to be held as made out on clear proof, that it was a "wilful, deliberate, and premeditated killing." The

[Kelly v. The Commonwealth.]

case called for the greatest care on the part of the court, to prevent the last ground from being prejudiced by the absence of a specific intent to kill, not necessary to be found in the first, if indeed the jury did not, under the charge, convict on the first. This consideration did not seem sufficiently, in the hurry of trial, to have attracted the attention of the court.

In dealing with this first ground, we think the court presented the case more strongly against the prisoner than was warranted by the evidence, or the law.   An attempt to commit a rape, in which killing occurs, is necessarily an overt act, indicating the intent and purpose of the assault, of which clear proof, sufficient to place the fact beyond a reasonable doubt, should be given.  A mere intention to commit the offence is nothing, unless accompanied by acts directed towards its accomplishment.  The killing, to constitute the crime of murder, without the specific intent to take life, must be clearly shown by the prosecution to have occurred in the performance of such acts as should establish the independent substantive crime.

It seems that the unlawful entry of the prisoner and his associates into the house of the deceased, took place on the night of the occurrence, near midnight.  They were all young men, and it would appear from the evidence, had been drinking.  When first heard, the deceased said "they were drunken men."  When it was discovered they were in the room in which the deceased and his daughter were in bed together, the former jumped out of bed, and asked "what they wanted?" when one of the party inquired "if the girl was in the house," to which the deceased answered, they should call and see her at another time, and something was said about drinking whisky, but by whom the witness could not remember.  She says they then took hold of her father, and she jumped out of bed, and with a bar of iron struck one of the party engaged with her father on the arm so severely, as to draw from him an exclamation indicative of pain, after which, it seems, she received a blow on the arm from the same person, which felled her.   There was no other attempt made upon her then, as we learn, and the prisoner and his associates left the room, and the deceased and the witness again retired to bed.  Thus far there was certainly no attempt on the girl; nor would it have been such as is necessary to constitute the crime, if the effort had been, as alleged, for there was scarcely a shadow of proof of it, to get the deceased out of the room with an intent to return again to the girl.   This would only have been a meditated attempt at most—not an actual one.  We learn from the charge of the court, for it does not appear on the paper-books, that the prisoner and his associates returned to the room.  A scuffle again ensued between the deceased and one of the party.  Before it began, the witness says she put into the hands of deceased a bar of iron, and with

[Kelly *v.* The Commonwealth.]

another piece in her hand fled out of the house to call assistance. That on going out, one of the party caught her by the leg, but she defended herself, and he let her go. That when she returned, she found the deceased lying on the floor with his scull fractured, of which he soon died, and the intruders gone.

In all this, where is the evidence of attempted rape? The fatal blow, according to the testimony of the girl, was given in her absence. Nothing like an attempt had occurred before she left the house—not even anything indicative of such design, we should say, and the parties were gone before she returned. The court, in the outset of charge, had distinctly submitted to the jury the question, whether the prisoner had killed the deceased, and "if in attempt to perpetrate a rape upon his daughter, he is guilty of murder in the first degree;" and on this inquiry, and as evidence, they direct the jury to consider "for what purpose the prisoner and his confederates go to that house that night? Was it for fornication or rape? This last can be answered by referring to the evidence; of this you will judge." At this point, the court direct the jury to the evidence of the acts of the prisoner and his associates; the entry into the house, and accompanying facts, and asks them "if they see anything like fornication or consent" to sexual intercourse? From this, the question of whether the intent to commit a rape was not the motive for entry and the motive for killing, was presented to the jury; and if so, it is declared to be a case of murder in the first degree. The court manifestly in all this substitutes "intent" for "attempt." If murder be committed with an intent afterwards to commit a rape, and the attempt is never made, the party would be answerable in the first degree only for the wilful, deliberate, and premeditated killing, but not for murder in the attempted rape. The intent is not equivalent to an *act* demonstrative of an attempt. The girl testified to no attempt on her person indicative of any such intent, and she was the only witness, unless it be what is said by her, about being caught as she fled. But in this she proves no demonstration towards the commission of the crime. Even if she had proved it, it does not appear that the prisoner caught her, and if he did not, he is not to be affected by the act of another, unless a common purpose to do the act attempted was shown to exist between that other and the prisoner; it is only in such cases, that the act of one shall be deemed the act of all. The court should have instructed the jury that *acts* are necessary to constitute an attempt, and that an attempt to commit a rape is an ineffectual offer, by force, with intent to have carnal connection. If such acts, with such intent, were not proved in the case, then the prisoner could not be convicted on this branch of it. On the contrary, the court submitted all the acts of the prisoner to the jury, to find, if they chose, an intent to commit a

[Kelly v. The Commonwealth.]

rape, which, if found, was to transform acts indifferent, or at most equivocal in regard to the girl, into an actual attempt upon her, and thus to change the whole inquiry, on the question of intentional· killing; for if it was perpetrated in an attempt to commit a rape, it would be murder in the first degree, as we have said, without regard to whether the killing was by design or accident. This shows the importance of great care in laying the law down on the question of an attempt. It should be an actual, not a constructive one.

If the entry into the house of deceased had been shown to have been burglarious, with the design to commit a rape, and the breaking and entry were pursuant to such design, it might have been considered under such circumstances, evidence of an attempt. But, to constitute it such, the specific intent to commit the crime must have existed at the moment of breaking and entering—not formed afterwards—for if so, the breaking could not be construed an attempt, as it had not this character in the minds of the prisoner and his associates, at the moment of doing the act.

2. If then the killing did not take place in an attempt to ravish, the case, whether capital or not, depended upon whether it was perpetrated "wilfully, deliberately, and with premeditation." The jury should have been charged to inquire, if the death was produced in an actual attempt to commit a rape; and if this was not clearly proven, so as to leave no reasonable doubt on the point, then their attention should have been turned to the second branch of the case, wherein the specific intent and purpose to kill, executed with deliberation and premeditation, constitute the great element of the case; divesting it, as far as possible, of any influence arising out of the first branch as an existing crime. It is no answer to these considerations to say, that the court was not requested so to charge. In capital cases it was a maxim of the common law, that the court were of counsel for the prisoner. They are certainly so, at least so far as to present to the jury clearly their views of the law, and advise with them on the points necessary to be considered, so that they may be able to come to the most correct and satisfactory conclusion that the case will admit of, whether requested to give special instruction or not. The Act of Assembly of 1856, requiring answers to points submitted in writing, makes no alteration in the law in this respect.

On the second branch of the case, we feel called upon to notice some portions of the charge, and we remark, in the first place, that the answer to the 9th point, although excepted to, but not assigned for error, was not, in our opinion, such an one as the prisoner was entitled to. The point was as follows:

"If the jury believe that the prisoners were strongly under the influence of liquor, at the time they entered the house of

[Kelly *v.* The Commonwealth.]

deceased, and the purpose was to visit the girl, and there was no intention to take life, but, in the excitement and tumult that ensued, the iron bar was suddenly caught up, and a blow or blows struck that killed the deceased, it is not murder in the *first* degree, but murder in the *second* degree. To which the court responded as follows:

" If the jury believe the 'prisoners were strongly under the influence of liquor, at the time they entered the house of the deceased,' and the facts are, in the opinion of the jury, as stated in this point, the state of the prisoner's mind, as affected by drink, may be given in evidence, as regards premeditation and deliberation, where the inquiry is, was the act ' wilful, deliberate, and premeditated ?' The probable state of the prisoner's mind would be proper evidence to be considered upon the degree. But if the killing was done in an attempt to perpetrate a rape, or in the attempt to perpetrate any other of the felonies enumerated in the act of assembly, the state of the prisoner's mind has nothing to do with it.

" It does not follow, of course, that if a man is strongly under the influence of liquor, either that he is incapable of premeditation or that he don't premeditate ; the fact of being in liquor may be given in evidence, from which the jury may infer the state of the mind.

" Where is the evidence that the prisoner and his companions were strongly under the influence of liquor ? The law presumes men are sober. The law does not presume they were drunk. It is stated by the prisoners that they bought liquor. It is admitted by the Commonwealth. Mrs. Fox, a witness called for the defence, who keeps a drinking house, testifies that they came into her house that night, and drank some ale ; that they came there sober, and went away sober."

The point called for, and was capable of a distinct answer, to the effect that if the prisoner and his companions were intoxicated, and there was no wilful and deliberate intention to kill, but life was taken by a blow inflicted with an iron bar, suddenly caught up on a sudden quarrel, it was not murder in the first degree, unless the killing was in an attempt to commit a rape. The point sought an answer on the effect of present intoxication. The court said it might be " given in evidence on the point of deliberation and premeditation," but did not say what effect it would have, if found to exist. So also they said it was proper evidence to be " considered upon the degree," but what influence it was to have on the case they did not say. In fact, it was no answer to the substance of the point. The law is well settled, that where a wilful and deliberate intent is the subject of investigation, " if the mind, from intoxication or any other cause, is deprived of its power to form a design with deliberation, the

offence is stripped of the malignant features required by the statute to place it on the list of capital crimes, and neither courts nor juries can lawfully dispense with what the act of assembly requires." U. S. Crim. Law, 405, 406; Whart. C. L. 41. Nor did the learned judge deny this. It may be presumed he meant it in his answer, but he should have expressed it. .

The Act of 1856, making cases of murder and manslaughter reviewable on exception, directs that where the opinion of the court, trying the case, is requested on any point submitted in writing, " it shall be the duty of the court to answer the same *fully*, and file the point and answer with the records in the case." The answer must be substantially full, to be a compliance with the act. Nor do I think the court in this answer was called upon to give the strong intimation of disbelief contained in it, as to the absence of intoxication. The purchasing and drinking of liquor had not only been proved, but was admitted by the Commonwealth. The point called only for direction in the investigation of the matter, and what would be the effect in the case of the prisoner, in the event of finding on the point, one way or the other. If the presence of intoxication, the absence of former grudges, the suddenness of the quarrel, or from any other cause, proof was wanting to establish clearly, a deliberate intention to kill, in the mind of the prisoner, or if the intent was doubtful, and the killing was not in an attempt to commit rape, it certainly was not murder in the first degree, although perhaps as certainly within the second. We think the answer to the point was insufficient, in a case of such penal consequences.

The 6th assignment of error also relates to the second branch of the case, and being the most important assigned by the prisoner's counsel, we will consider it here. After the answers to the points had been given, the court amongst other things charged, that " when a deadly weapon is used in a deadly manner; when an instrument likely to kill, is used in a manner that does kill, drunkenness can have no effect on the consideration of malicious intent; of malice, because the instrument of death used, is stronger evidence of malice than drunkenness, even if proved, can be of the absence of malice. The presumption of law is against him."

By the Act of 1794, murder by means of poison, or by lying in wait, or " any other wilful, deliberate, and premeditated killing," is murder in the first degree. Where the crime was not committed in the attempt to perpetrate either of the felonies mentioned, in which a specific intent is not an element, the legislative will is most carefully expressed, to limit the capital offence to cases where it is the result of a wilful, deliberate, and wicked purpose. Poisoning and lying in wait are enumerated, and "any *other* wilful and deliberate killing," is placed side by side as

[Kelly *v.* The Commonwealth.]

equally heinous, because equally the result of a wicked settled purpose, and to be followed by precisely the same punishment. The collocation of these varieties in which the crime may occur, serves to show that all belong to the same species, that they spring from the same root, which is, will—deliberate purpose. It must ever be remembered that this disposition of mind, leading. its victim into murder, all aware of its wicked pursuit, and intent upon the result, is the distinguishing trait between murder in the first and second degree. It is a positive element, and its presence must be proved according to law, beyond the probability of a reasonable doubt. If it be not proved, there is no capital offence,—it is as essential to its grade, as is killing itself, and cannot be supplied by any other ingredient. If it be not proved and the killing be with malice, but upon a sudden quarrel, or great provocation, it is by the act of assembly "*deemed* to be murder in the second degree." If not proved to belong to the first class, it is presumed to belong to the second, and this should be carefully presented to the juror's mind in all such trials, and he should conscientiously act upon it, regardless of everything but duty.

Whatever, therefore, negatives the existence of deliberation, or when not clearly shown to be present, or reasonable doubts of its presence remain, or it does not appear whether life was not taken in passion and tumult, under all such circumstances, the grade is fixed by the presumption of law as of the second degree. It is apparent, therefore, that the operation of the mind gives the capital quality alone to murder. Not that mind does not exist in both grades, but it deliberates and purposes in the one,—acts impulsively in the other. Passion from great provocation has always been held to mitigate the grade, because of the inference from it negativing deliberation. So too, has drunkenness, when made out. It is equally as obnoxious to deliberation as passion, and requires as careful consideration in the judicial investigation. It does not excuse crime, but if its existence is incompatible with the ingredients constituting crime of a particular grade,—then it cannot be of that grade,—it must belong to a lower one if the law so provides.

The error in this portion of the charge of the learned judge, consists rather in the unrestricted nature of the remark than in the remark itself. I do not doubt the correctness of the position, that malice may be inferred from the use of an instrument likely to kill. But without more this would be murder in the second degree. It will not do to substitute the catastrophe alone for the crime of the highest grade, in which is required as an essential the deliberate purpose, and if we would avoid this, we must be careful not to apply tests indicative of one grade, as guiding us to correct conclusions in another. More is necessary than a blow with an instrument likely to kill, to constitute murder of the first

degree,—there must be intention, deliberation and premeditation found; and the instrument is evidence on this point. If this do not appear, the use of an instrument in a sudden quarrel, although likely to kill, and killing ensues, leaves the grade of the crime of the second degree. But it was a peremptory instruction, that "when an instrument likely to kill is used in a manner that does kill, drunkenness *can have no effect* on the consideration of malicious intent, because the instrument of death used is stronger evidence of malice than drunkenness, *even if proved*, can be of the absence of malice." The law sets up no such rule, in murder of the first degree, and this instruction being unrestricted as to the degree to which it was applicable, may have misled the jury, and in all likelihood did, by dispensing with all but the evidence of the instrument used, instead of the intent and deliberation with which it was used. The Act of 1794, was designed to mitigate the existing rules of the common law, which involved in a common fate convicts almost infinitely separated in the heinousness of their crimes; the poisoner, the assassin, the deliberate murderer, with the slayer through the infirmity of passion. The burden of extenuating the crime lay on the prisoner,—he must mitigate the presumed intent, or his case was capital. A great change was introduced. Forfeiture of life was thereafter to follow only when in each individual case, the State had clearly established that depravity of disposition that exhibits "a heart regardless of social duty and fatally bent on mischief." It is vital to the due administration of justice in its criminal department, that the distinctions marking the degrees in this mitigating act, should not be suffered to become obscured. We think there was error in this part of the charge.

The first, second, third and fourth errors are not sustained, nor can we say there is any ground for the fifth, as the evidence in regard to Wilhelmina Weissman seems to have been received.

After a careful examination of this case, we feel it our duty to direct a re-trial of it, when under the views expressed, the following positions will in their order necessarily arise.

1. Did the prisoner strike the mortal blow, or was he present aiding and assisting when it was struck? If so,

2. Did the killing take place in an attempt to commit a rape, manifested by acts clearly indicating it? If it did, it is murder in the first degree. If not, then

3. Was the killing "wilful, deliberate and premeditated?" If so, murder in the first degree. But if this be not clearly established by the Commonwealth, by proof of a settled purpose to take life, in which the absence of a previous grudge, the occurrence of a sudden tumult, and the use of an instrument wrested from the deceased, are considerations of importance against deliberations, then

[Soohan *v.* Philadelphia.]

4. Was it murder in the second decree? which may be the case, where the blow was given with no deliberate purpose or design to take life, although with an instrument likely to do great bodily harm, and death ensued; then from the absence of proof of deliberate intent, the law *deems* such killing murder in the second degree. It is not murder in the first degree.

It is of the utmost consequence to the public, that the criminal law be firmly, but cautiously administered, and that punishment be duly and fairly proportioned to crime. " *Culpa pœna par esto. Pœna mensuram delicti statuenda est.*"

Judgment reversed, and a new trial awarded.